IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-430

Filed 1 July 2026

Alamance County, Nos. 20 CR 052197-000, 20 CR 052198-000, 20 CR 052200-000, 20 CR 052212-000, 20 CR 052213-000.

STATE OF NORTH CAROLINA

v.

ALI ASGHARI SANDI, Defendant.

Appeal by Defendant from judgment entered by Judge D. Thomas Lambeth in Alamance County Superior Court. Heard in the Court of Appeals 15 January 2026.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Robert C. Montgomery, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender James R. Grant, for the Defendant–Appellant.*

MURRY, Judge.

Ali A. Sandi (Defendant) appeals from jury verdicts convicting him of attempted first-degree murder, first-degree kidnapping, assault by strangulation, assault with a deadly weapon with intent to kill inflicting serious injury (AWDWIKISI), assault with a deadly weapon inflicting serious injury with a minor present, and misdemeanor child abuse. On appeal, Defendant argues the trial court erred (1) by denying his motion for a mistrial in response to the conduct of the prosecuting witness's court-appointed interpreter; (2) by denying his motion to

dismiss the charge of first-degree kidnapping for insufficient evidence; and (3) by denying his motion to dismiss the charge of misdemeanor child abuse for insufficient evidence. For the following reasons, we disagree and hold the trial court did not err in any respect.

## I.    Background

This matter arises out of a physical altercation between Defendant and his then-wife, Haniyeh Khodaverdian. Defendant and Haniyeh married in Iran, immigrated to the United States in 2012, and settled in Alamance County. Both Defendant and Haniyeh are Iranian nationals and speak Farsi as their native language. They have two children: a son and a daughter (respectively, "Son" and "Daughter").[1]

The evidence at trial tended to show the following: On 13 May 2020, Defendant told Haniyeh he wanted a divorce and demanded she go "to the attorney and tell him that [she] d[id] not want anything." Haniyeh agreed to the divorce but asked to remain in the home until the children grew up or until she could find employment. Defendant then hit her in the face. The next morning, Defendant demanded that Haniyeh give him Daughter's passport. When she refused, Defendant hit her, pulled her hair, and punched her in the chest.

Later that day, Haniyeh and Daughter were sleeping in the marital bedroom

---

[1]    Daughter was around six years old at this time.

until Defendant and Son entered the room arguing. After Haniyeh asked Defendant to be quiet, Defendant pushed her onto the bed and began strangling her, awakening Daughter. At some point, Son struck Defendant on the back with an object, causing Defendant to release Haniyeh. Defendant and Son continued arguing as they both left the room.

Shortly thereafter, Haniyeh heard Son yell that Defendant had a knife. Haniyeh and Daughter tried to prevent Defendant from entering the bedroom by holding the door shut, but Defendant forced it open by punching and kicking it. Once Defendant made his way inside, Haniyeh told Daughter to go to the bed. Armed with a knife, Defendant trapped Haniyeh between the door and a dresser and repeatedly stabbed her while saying, "I kill you." Son attempted to intervene by grabbing Defendant and trying to take the knife while urging Haniyeh to flee. Haniyeh escaped to a neighbor's home and called 911. Police and paramedics arrived at the scene. Following a prolonged and violent struggle with Defendant, responding officers subdued and arrested him. At the hospital, a forensic nurse examiner documented and photographed Haniyeh's injuries, which included multiple bruises on her back, arms, legs, shoulders, head, and face.

On 26 May 2020, a grand jury indicted Defendant on twenty-one felonies arising from his conduct towards Haniyeh and law-enforcement officers in the

children's presence.[2] Defendant declined the trial court's offer of an interpreter. The trial court appointed Mousa Sadredduni (the interpreter) to translate for Haniyeh. At the 19 February 2024 trial, the State presented evidence of Haniyeh's multiple stab wounds, bruising, and injuries consistent with strangulation, including petechial hemorrhaging and neck trauma. Haniyeh testified to Defendant's conduct and the events leading up to her injuries.

Throughout the trial, defense counsel objected to several aspects of the interpreter's conduct and translations. The trial court eventually interrogated the interpreter *voir dire* regarding his qualifications under and familiarity with the Administrative Office of the Courts's (AOC) published ethical and procedural standards for foreign-language interpreters in North Carolina's state courts (Standards). *See generally* John W. Smith, *Standards for Language Access Services* (2017) [hereinafter *Standards*], https://www.nccourts.gov/assets/inline-files/02_2_NC _Standards_for_Language_Access_0.pdf?NhuszCAEVfS8KkdLetH97b9I4NRBcd.f (last visited June 23, 2026).

Defendant then moved for a mistrial, arguing the interpreter's translations and associated "behaviors" created a legal defect in the proceedings and violated his

---

[2]  While not pertinent to this appeal, Defendant's additional charges included assault with a deadly weapon on a government official, assault with a deadly weapon with intent to kill, two counts of assault inflicting serious injury upon a law enforcement officer, and assault on a law enforcement animal.

right to a fair trial. Specifically, Defendant claimed the translator erred by: (1) mimicking Haniyeh's stabbing hand motions when translating testimony about the stabbing; (2) choosing "the English [words] that he believed best fit from his own experience that may not be what [Haniyeh] intended" "as opposed to asking the Court for its guidance" "when faced with multiple options or a word that ha[s] multiple meanings in Farsi"; (3) mistranslating the word *knife* as *gun* before "immediately" correcting himself; and (4) repeating the word *go* twice when Haniyeh said it once. Defendant argued the interpreter "ma[de] himself a witness" by "choosing words and making motions" that "emphasiz[ed] the English translation" in an effort "to influence th[e] jury."

The trial court denied the motion, finding "th[o]se explanations of words like *eventually* versus *a short passage of time* . . . innocuous" enough to "not be error beyond a reasonable doubt," thus not "ris[ing] to the level . . . [of] a mistrial." (Italics added.) It did express "concern" about certain "hand gestures" that it "did not see but . . . acknowledged to have happened while [Haniyeh] was on the stand" and made sure that the interpreter "underst[ood] that [wa]s not to happen again." The trial court said as much after Haniyeh "gave a demonstration of . . . how she recalls the stabbing happening" without any additional "hand gestures made by the interpreter." It concluded that Haniyeh's subsequent actions demonstrating the stabbing for the jury "cured any issue that could have . . . substantial[ly] and irreparabl[y] prejudice[d]" Defendant. The trial court then notified the parties "that if . . . other

circumstances . . . come up" where Haniyeh might say a word in Farsi "that might le[a]d to two different English words," it would "stop and try to . . . get the exact meaning of what she is saying without any confusion." The trial court concluded by offering Defendant a limiting instruction for the jury regarding the interpreter's mimicking of Haniyeh's hand motions, which he declined in a strategic effort to avoid calling "more attention" to the conduct.

At the close of the State's evidence, Defendant moved to dismiss the charges of first-degree kidnapping and misdemeanor child abuse for insufficient evidence; the trial court denied both motions. Defendant did not testify or otherwise present evidence in his own defense. The jury returned verdicts in relevant part convicting Defendant of attempted first-degree murder, first-degree kidnapping, assault by strangulation, AWDWIKISI, assault with a deadly weapon inflicting serious injury with a minor present, and misdemeanor child abuse. The trial court consolidated the guilty verdicts into six consecutive aggravated judgments and sentenced Defendant to 323–432 months of imprisonment. Defendant timely appealed.

## II.    Jurisdiction

This Court has jurisdiction over Defendant's appeal from the trial court's final judgment under N.C.G.S. §§ 7A-27, 15A-1444. *See* N.C.G.S. § 7A-27(b) (2025) (final judgment of a trial court); *id.* § 15A-1444(a) (pleaded not guilty but found guilty).

## III.    Analysis

Defendant argues the trial court erred by (1) denying his motion for a mistrial

after the interpreter "repeatedly violated AOC's code of ethics for interpreters in a manner that reasonably called into question his training and impartiality";[3] (2) denying his motion to dismiss the charge of first-degree kidnapping for lacking any "evidence of confinement, restraint, or removal separate from any which was inherent in the assaults and attempted murder"; and (3) denying his motion to dismiss the charge of misdemeanor child abuse for lacking any "evidence that [Daughter] was at a 'substantial risk of physical injury' during the assaults." For the following reasons, we disagree and hold that the trial court did not err.

## A. Motion for a Mistrial

First, Defendant argues the trial court erred in denying his motion for a mistrial because the interpreter's "disregard for AOC's code of ethics" constituted "an error or legal defect" that "result[ed] in substantial and irreparable prejudice to [his] case." N.C.G.S. § 15A-1061. He alleges the interpreter's translations and "behaviors

---

[3] Defendant appears to challenge the trial court's denial of his mistrial motion, but his contentions are based on unclear grounds. Defendant ostensibly argues that the trial court should have declared a mistrial after the interpreter "repeatedly violated AOC's code of ethics." But his brief presents a "scattershot" series of arguments under a single assignment of error—many of which are unpreserved and none of which permit meaningful appellate review. *See, e.g. Clark v. Dyer*, 236 N.C. App. 9, 15 (2014). He first claims that "the trial court [did not] consider[ ] whether an interpreter was necessary at all." He then claims that the interpreter "repeatedly violated AOC's promulgated ethics standards," "expressed ignorance as to those standards," "g[a]ve[ ] the appearance of bias" with his "previous involvement in the case," and "responded with personal offense and an offer to recuse when defense counsel questioned his interpretation's adherence to AOC standards." Because Defendant largely did not raise these arguments as "specific grounds" in support of his motion for a mistrial, he failed to preserve them as grounds for our review here. *See* N.C. R. App. P. 10(a)(1). We thus dismiss all but one of Defendant's interpreter-related arguments for failure to clearly define the issues presented under Appellate Rule 28. *See id.* 28.

associated [there]with" violated his right to a fair trial by: (1) mimicking Haniyeh's stabbing hand motion when translating testimony about the stabbing; (2) choosing "the English [words] that he believed best fit from his own experience that may not be what [Haniyeh] intended" "as opposed to asking the Court for its guidance" "when faced with multiple options or a word that ha[s] multiple meanings in Farsi"; (3) mistranslating the word *knife* as *gun* before "immediately" correcting himself; and (4) repeating the word *go* twice when Haniyeh said it once. Considering the record in light of this limited basis for review, we hold that the trial court did not "abuse its discretion" in denying Defendant's motion for a mistrial. *State v. Call*, 349 N.C. 382, 406 (1998).

## 1. *Standard of Review*

As noted above, Defendant moved for a mistrial in response to the interpreter's conduct. A mistrial is a "drastic remedy, warranted only for such serious improprieties as would make it impossible to attain a fair and impartial verdict." *State v. Stocks*, 319 N.C. 437, 441 (1987). Generally, we review the trial court's denial of a mistrial for abuse of discretion and may reverse it "only upon a showing that its ruling was manifestly unsupported by reason." *State v. Miles*, 221 N.C. App. 211, 216 (2012). But when a defendant raises a question of law—such as whether the trial court properly interpreted and applied statutory language—we conduct *de novo* review. *See Da Silva v. WakeMed*, 375 N.C. 1, 5 (2020) (reviewing alleged error of law *de novo*); *accord Koon v. United States*, 518 U.S. 81, 100 (1996) ("A trial court by

definition abuses its discretion when it makes an error of law." (citation modified)).

Defendant attempts to invoke our *de novo* review by arguing that the trial court misapplied the law by declining to declare a mistrial where the interpreter's "ignorance of and repeated disregard" for the Standards was "constitutionally intolerable" and "violated [his] right to due process." Essentially, Defendant us to review these Standards as a question of law entitling him to certain constitutional protections, but Defendant does not cite—nor can we find—any statute or case law incorporating these Standards into binding law. Having reviewed these Standards within our State's constitutional framework, we hold that the trial court did not abuse its discretion in denying Defendant's motion for a mistrial.

### 2. *Interpreter Standards*

The North Carolina Constitution vests the General Assembly with the authority to "enact laws, within constitutional limits, to protect or promote the health, morals, order, safety, and general welfare of society." *State v. Ballance*, 229 N.C. 764, 769 (1949). The General Assembly may delegate limited legislative authority to an agency in another Branch if it has "declared the policy to be effectuated and has established the broad framework of law within which it is to be accomplished and standards for [its] guidance," *Foster v. N.C. Med. Care Comm'n,* 283 N.C. 110, 119 (1973)—in particular, "an administrative office of the courts," N.C. Const. art IV, § 15.

In 1965, the General Assembly created the AOC as an administrative agency

within the Judicial Branch. *See* Judicial Department Act of 1965, ch. 310, § 1, 1965 N.C. Sess. Laws 369, 418. It also established the position of AOC Director as the "Administrative Officer of the Courts" who must fulfill certain statutorily defined duties, *id.*, which it later expanded to "[p]rescrib[ing] policies and procedures for the appointment and payment of foreign language interpreters . . . [to] be applied uniformly throughout the General Court of Justice," Act of Aug. 3, 2006, S.L. 2006-187, § 5(b), 2006 N.C. Sess. Laws 681, 685.

Under that authority, AOC adopted the Standards after a 2012 United States Department of Justice (DOJ) investigation found widespread language-access deficiencies across North Carolina's state-court systems in violation of Title VI of the Civil Rights Act. Press Release No. 22-1148, U.S. Dep't of Just., Off. Pub. Affs. (Oct. 25, 2022), https://www.justice.gov/archives/opa/pr/justice-department-resolves-langu age-access-investigation-north-carolina-courts (last visited June 23, 2026). The Standards formalize "best practices" that our state courts must "follow when providing language access services to individuals with limited English proficiency" and obligate AOC "to provid[e] meaningful access to its courts [for] all individuals, regardless of national origin or limited ability to read, write, speak, or understand English." *Standards*, § 1.2. They seek to ensure "accurate communication in court proceedings, protecti[on of] the integrity of evidence, and [the] provi[sion of] language[-]access policies, services, and resources that enhance . . . interpreting and translation services in North Carolina state courts." *Id.* § 1.1. The Standards serve

an important administrative function, but they do not create a legal right to a state-court interpreter—nor could they. Although the power to grant this right rests with our General Assembly alone, *see, e.g.*, N.C.G.S. §§ 8B-1 to -2 (establishing statutory right to court interpreter for deaf individuals), the ability to appoint an interpreter per se stems from "the inherent powers of the court" to "proper[ly] transact[ ] . . . its business," *Wise v. Short*, 181 N.C. 320, 322–23 (1921) (citing 11 *Cyclopedia of Law and Procedure* 720 (1904)).

### 3. *Inherent Powers*

That distinction matters here. As noted, a trial "court has inherent authority to appoint a foreign[-]language interpreter when, in [its] discretion . . . , an interpreter is 'necessary.'" Thomas L. Fowler, Matt E. Osborne, & Stephanie S. Scarce, *Interpreting in the Courts: The AOC's Guidelines*, N.C. State Bar J., Spring 2002, at 24 (quoting *State v. Torres*, 322 N.C. 440, 443 (1988)). A trial court's inherent authority—*i.e.*, inherent power—"to effectively administer justice" stems from our State Constitution and cannot "be abridged by the legislature." *Beard v. N.C. State Bar*, 320 N.C. 126, 129–30 (1987); *cf.* N.C.G.S. § 84-36. But as that Constitution expressly contemplates, *see* N.C. Const. art. IV, § 15, we must "occasionally exercise[ ]" this "scope of inherent power" "in the area of overlap between [B]ranches," *In re Alamance Cty. Ct. Facilities*, 329 N.C. 84, 96 (1991) (ellipses omitted). Where an "overlap of power between [our L]egislative and [J]udicial [B]ranches is inevitable," our Supreme Court counsels a "judicious use of . . . inherent power" that both "bow[s]

to established procedural methods" as "an alternative" to its otherwise "extraordinary exercise" and "minimize[s] the encroachment upon those with legislative authority." *Id.* at 97, 100–01. In other words, the AOC Director has authority to put in place procedures to preserve the Judicial Branch's inherent power to maintain "public . . . confidence in our system of justice" subject to the Legislative Branch's duty to prescribe "an administrative office of the courts to carry out th[ose constitutional] provisions," N.C. Const. art. IV, § 15.[4]

This distinction constrains Defendant's argument on appeal. To be sure, we have recognized in dictum that particularly egregious "translation difficulties could violate a non-English speaking defendant's constitutional right to a fair trial." *State v. Uvalle*, 151 N.C. App. 446, 452 (2002). Yet Defendant identifies no applicable regulation amidst his repeated claims that the interpreter's "violation of AOC [S]tandards, coupled with his hostility to both their existence and the defense's insistence that he abide by them, amounted to a violation of . . . [his] right to due process." We cannot review a question of law where Defendant identifies no such

---

[4]  We note that the Constitution's Article IV vests the General Assembly with "exclusive[ ] responsib[ility] for raising the funds that sustain . . . [us] and preserve [our] autonomy." *In re Alamance Cty. Ct. Facilities*, 329 N.C. 84, 97 (1991). Were the General Assembly to exercise its "right, at any time, to change th[e] method of the [D]irector['s] appointment . . . and the [AOC's] operation," Raymond B. Mallard, *Inherent Power of the Courts of North Carolina*, 10 Wake Forest L. Rev. 1, 16 (1974), this "scope of the inherent power" might change "in the area of overlap between [the B]ranches." *Alamance*, 329 N.C. at 96. Because neither of these statutory mechanisms of control have substantively changed since the original Judicial Department Act of 1965, though, we need not address this "purely hypothetical question" now. Bryan A. Garner et al., *The Law of Judicial Precedent* 133 (1st prtg. 2016). *See generally* N.C.G.S. Ann. §§ 7A-341, -343, at 509–10, 514 (LexisNexis 2025) (documenting no material amendments to statutory "appointment by the Chief Justice of the Supreme Court").

question and thus turn to the applicable standard of review regarding a claim of violated AOC Standards.

Although we have not addressed the extent of discretion afforded to a trial court's assessment of an interpreter's conduct, our review of administrative actions— here, the Standards' promulgation—generally falls "under one of three standards in North Carolina: *de novo* review; a 'substantial evidence on the whole record' test; or an 'any competent evidence' test." *In re Rogers*, 297 N.C. 48, 61 (1979) (quotation omitted). For the reasons below, we hold that an assessment of an interpreter's compliance with the Standards is part of "the conduct of the trial" subject to "the sound discretion of the trial court." *State v. Lindsey*, 25 N.C. App. 343, 347 (1975).

Our standard of review here "depends upon the nature of the alleged error." *In re McCrary*, 112 N.C. App. 161, 166 (1993). In determining this proper standard, we find it necessary to briefly revisit the three theoretical possibilities in hierarchical order: (1) a *de novo* review for any "errors of law," *id.*, (2) the "whole-record" test that "examine[s] *all* competent evidence," *County of Wake v. N.C. Dep't of ENR*, 155 N.C. App. 225, 233 (2002) (emphasis added), and (3) an "abuse-of-discretion" test that merely looks for "*any* competent evidence," *Beightol v. Beightol*, 90 N.C. App. 58, 60 (1988) (emphasis added).

### a.  De Novo *Review*

As previously mentioned, Defendant frames his argument as a question of law that merits *de novo* review, arguing that the trial court misapplied the law by

declining to declare a mistrial in response to the interpreter's conduct. But he identifies no authority suggesting these Standards afford him any additional constitutional protections. As our Supreme Court recently reaffirmed, we review *de novo* the "*state agency's* interpretation of its own rules or regulations," not a *trial court's* subsequent application of that regulation to a given fact pattern. *Mitchell v. UNC Bd. of Govs.*, 388 N.C. 341, 343 (2025) (emphasis added). And because we "seldom appl[y]" *de novo* review "in the absence of an express statutory provision," we "neither contemplate[ ] nor warrant[ it] here." *Rogers*, 297 N.C. at 61. That leaves two other options.

### b. *Whole-Record Test*

Under the whole-record test, we examine the record for "all the competent evidence" to determine whether "substantial evidence" supports the decision below. *McCrary*, 112 N.C. App. at 168; *see* Administrative Procedure Act, ch. 1331, § 1, 1974 N.C. Sess. Laws 691, 701 [hereinafter APA] ("[u]nsupported by substantial evidence . . . in view of the entire record"). This test is "less deferential" than one for an abuse of discretion, *In re Se. Baptist Theo. Seminary*, 135 N.C. App. 247, 254 (1999), and thus "merely gives [us] . . . the capability to determine whether an administrative decision has a rational basis," *Rogers*, 297 N.C. at 65. Much like with the abuse-of-discretion test, we ultimately may "not substitute our own judgment" for that of either the lower court or the AOC Director in this context, "even . . . [with] conflicting views of the evidence" at hand. *Seminary*, 135 N.C. App. at 254.

If we were to treat the Standards as administrative regulations, a superficially plausible case could be made that the General Assembly has "endorsed" this test "as the principal method of judicial review" to apply here. *Rogers*, 297 N.C. at 64–65. Despite the APA's exclusion of "those agencies in the [L]egislative or [J]udicial [B]ranches" from the definition of "Agency," APA, § 1, 1974 N.C. Sess. Laws at 692, our Supreme Court has expressly adopted the APA's whole-record test as the preferred method on multiple occasions (and for certain Judicial Branch agencies, no less), *e.g.*, *Rogers*, 297 N.C. at 62 (Board of Law Examiners); *N.C. State Bar v. DuMont*, 304 N.C. 627, 642 (1982) (State Bar Disciplinary Hearing Commission); *see* L. Thomas Lunsford III, *Lest We Be Misunderstood*, N.C. State Bar J., Spring 2015, at 6 ("[T]he State Bar is an arm of the judiciary.").

We decline to similarly apply the whole-record test to the promulgated Standards in the same manner as the *Rogers* and *DuMont* Courts did for two distinct reasons. First, the Standards merely articulate and formalize our inherent power to oversee "the orderly and efficient exercise of the administration of justice" for all the reasons described above. *Beard*, 320 N.C. at 129; *accord Standards*, § 3.1 ("The Director . . . promulgates policies and procedures that effectuate the efficient administration of justice throughout the Judicial Branch."). The Director also houses the Standards firmly within the Judicial Branch as a normative matter by promulgating them in his capacity as "an officer of the General Court of Justice." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 138 (G. Alan

Tarr ed. 2d ed. 2013); *see Alamance*, 329 N.C. at 100 ("[T]he court[ ] . . . must bow to established procedural methods . . . ."). Second (and more important), the *Rogers* and *DuMont* Courts extended the APA's review standards to judicial agency *adjudications*, not rule promulgations per se. After reviewing the Standards here, only § 15's explanation of "disciplinary procedures for authorized spoken foreign language court interpreters" conceivably implicates an AOC adjudication that might merit a whole-record review in this context. *Standards*, § 15.1. But Defendant did not "submit a complaint against an authorized court interpreter" that documented his "alleged improper conduct," *id.* § 15.4; he instead challenges the trial court's mid-proceeding assessment of the interpreter's conduct and denial of his motion for a mistrial. Thus, we decline to apply the whole-record test here.

### c. Abuse-of-Discretion Test

Both the grant of a mistrial and the appointment of a foreign-language interpreter lie "within the sound discretion of the trial court." *State v. Williamson*, 333 N.C. 128, 139 (1992) (mistrial); *Torres*, 322 N.C. at 443–44 (citing *Wise*, 181 N.C. at 322) (interpreter appointment). The trial court may declare a mistrial if a "legal defect in the proceedings or conduct inside . . . the courtroom . . . result[s] in substantial and irreparable prejudice to the defendant's case," N.C.G.S. § 15A-1061 (brackets omitted), and may appoint an interpreter under its "inherent authority," *Torres*, 322 N.C. at 443. A trial court abuses its discretion only by "mak[ing] a patently arbitrary decision, manifestly unsupported by reason." *Buford v. Gen.*

*Motors Corp.*, 339 N.C. 396, 406 (1994); *see State v. Hill*, 347 N.C. 275, 297 (1997) (The trial court's decision of whether to grant a mistrial is "given great deference because the trial court is in the best position to determine whether the degree of influence on the jury was irreparable."). The inquiry into an interpreter's performance is part of "the orderly conduct of the trial" and "the proper administration of justice" within the trial court's discretion—absent a statutory codification of the Standards or other "govern[ance of] the situation." *State v. Aytche*, 98 N.C. App. 358, 363 (1990). For the reasons above and below, we hold that this discretion extends to assessing whether a foreign-language interpreter's performance results in "substantial and irreparable prejudice to the defendant's case" warranting a mistrial. N.C.G.S. § 15A-1061.

Here, Defendant moved for a mistrial based on the interpreter (1) mimicking Haniyeh's stabbing hand motion when translating testimony about the stabbing; (2) choosing "the English [words] that he believed best fit from his own experience" instead of "asking the Court for its guidance" "when faced with multiple options . . . in Farsi"; (3) mistranslating the word *knife* as *gun* before "immediately" correcting himself; and (4) repeating the word *go* twice when Haniyeh said it once. In considering Defendant's motion, though, the trial court made numerous oral findings demonstrating its thoughtful and deliberative consideration of (but ultimate disregard for) the notion that any of these behaviors prejudiced Defendant's case. It found the innocuity of the interpreter's "explanations of words" with multiple

meanings, his verbal repetitions, and his brief mistranslations—all of which the trial court promptly "clarified very clearly in front of the jury." It notably expressed its "biggest concern" for the interpreter's mimicking of Haniyeh's hand gestures but then concluded that her physical demonstration of the stabbing "moments later" "cured any issue that could have been . . . substantial[ly] and irreparabl[y] prejudic[ial]" to Defendant's case. The trial court also offered Defendant a limiting instruction to the jury, which he strategically refused. The trial court's denial of Defendant's motion was neither "arbitrary nor manifestly unsupported by reason" in light of these facts. *Miles*, 221 N.C. App. at 216. Because the trial court "is in the best position to determine whether the degree of the influence on the jury was irreparable," we hold that the trial court did not abuse its discretion in denying Defendant's motion for a mistrial. *Hill*, 347 N.C. at 297.

## B. Motions to Dismiss

Defendant next argues the trial court erred in denying his two motions to dismiss the charges of misdemeanor child abuse and first-degree kidnapping for insufficient evidence. On appeal, we determine whether substantial evidence supports (1) "each essential element of the crime" and (2) that "the defendant . . . perpetrat[ed]" it. *Call*, 349 N.C. at 417. "[S]ubstantial evidence" is any "relevant evidence . . . adequate to support a conclusion," *State v. Franklin*, 327 N.C. 162, 171 (1990), which evidence "need only . . . satisfy a reasonable mind" on review, *State v. Butler*, 356 N.C. 141, 145 (2002). The trial court must view all "evidence in the light

most favorable to the State, granting . . . [it] every reasonable inference to be drawn [there]from." *Call*, 349 N.C. at 417. "[A]ny evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction . . . is for the jury" to decide "beyond a reasonable doubt." *Franklin*, 327 N.C. at 171–72. "[T]he only question before us . . . is whether a reasonable juror *could* have concluded that the defendant was guilty based on the evidence presented by the State." *State v. Watkins*, 247 N.C. App. 391, 396 (2016).

If the evidence permits a reasonable inference of the defendant's guilt, "then it is for the jury to decide whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is actually guilty," *State v. Blagg*, 377 N.C. 482, 489 (2021) (quotation omitted), "even [if] the evidence also permits a reasonable inference of the defendant's innocence," *State v. Miller*, 363 N.C. 96, 99 (2009). "The province of the jury should not be invaded in any case, and when reasonable minds, acting within the limitations prescribed by the rules of law, might reach different conclusions, the evidence must be submitted to the jury." *State v. Clark*, 183 N.C. 733, 734–35 (1922). For this reason, in "borderline or close cases, our courts have consistently expressed a preference for submitting issues to the jury." *Blagg*, 377 N.C. at 489. Having reviewed the dismissals *de novo*, we disagree with Defendant and hold that the trial court did not err by denying either of Defendant's motions to dismiss. *State v. Cox*, 367 N.C. 147, 151 (2013).

### 1. Misdemeanor Child Abuse

Defendant argues the trial court erred in denying Defendant's motion to dismiss the charge of misdemeanor child abuse. He asserts that the State offered "no evidence that [Daughter] was at 'substantial risk of physical injury' during" Defendant's assault of Haniyeh. We disagree.

A "parent of a child less than [sixteen] years of age" commits misdemeanor child abuse by either "inflict[ing] physical injury, . . . allow[ing] physical injury to be inflicted, or . . . allow[ing] to be created a substantial risk of physical injury" to the child "by other than accidental means." N.C.G.S. § 14-318.2(a). Here, Defendant does not dispute that Daughter is less than 16 years old, and the State proceeded under the theory that Defendant "created a substantial risk of physical injury" to the child. *Id*. Thus, to survive Defendant's motion to dismiss, "the State must introduce substantial evidence" tending to show that Defendant "by other than accidental means . . . created or allowed to be created a substantial risk of physical injury upon the child." *Watkins*, 247 N.C. App. at 395. Because N.C.G.S. § 14-318.2(a) does not explicitly define "substantial risk of injury," though, we "engage[ ] in a fact-specific inquiry to determine if such risk exists." *State v. Adams*, 285 N.C. App. 379, 384 (2022). Although our courts have not addressed the sufficiency of the evidence in this precise factual scenario, they have done so under the substantial-risk theory of misdemeanor child abuse in other circumstances. We find instructive *State v. Watkins* and *State v. Adams*.

In *State v. Watkins*, we held that a lack of parental supervision can create a

"substantial risk of injury" without causing actual physical harm to the child. 247 N.C. App. at 391. There, the defendant had left her two-year-old son "alone and helpless" inside a car with its windows over halfway down in eighteen-degree snowy weather for over six minutes. *Id*. at 395. We determined that "a reasonable juror could have found that [the defendant] created a substantial risk of physical injury" by other than accidental means "[g]iven the harsh weather conditions, [the child's] young age, and the danger of hi[s] . . . abduct[ion] . . . due to the window being open more than halfway." *Id*. (quotation omitted); *see State v. Benton*, 301 N.C. App. 32, 37 (2025) (sufficient evidence of lack of parental supervision creating substantial risk of injury where it showed that six-year-old child wandered over a mile after defendant left her unattended at public park).

In *State v. Adams*, we held that the "mere act of pulling" a child can create a "substantial risk of injury" despite a short duration, lack of intent, and no actual harm to the child. There, the defendants tried to remove their child from a car by pulling him in opposite directions, dislodging his car seat from its "strapped in" position, and causing him to "cry out" in pain. *Adams*, 285 N.C. App. at 387. Seeing that "*Watkins* [was] the sole reported case applying the 'substantial-risk' prong," we reviewed several unpublished cases and observed that the risk length and actual harm to the child was not dispositive because "the potentially dangerous incidents were quite brief, just minutes, and in all but one case the children involved were fortunately unharmed." *Id.* Based on those cases, we reasoned that a parent could expose a child

to a substantial risk of physical injury merely by intentionally engaging in conduct that exposes her to that risk. The dispositive question is the sufficiency of the State's evidence as to whether "the actions 'created a substantial risk of physical injury' . . . by 'other than accidental means.' " *Id.* at 386–87 (quoting *Watkins*, 247, N.C. App. at 396).

Accordingly, we must determine whether the State presented substantial evidence from which a jury could "reasonably" infer that Defendant's assault on Haniyeh placed Daughter at "substantial risk of injury"—notwithstanding Defendant's intent to expose her to such risk, its duration, and whether she actually suffered injury. *Franklin*, 327 N.C. at 171–72. Here, the evidence tended to show that, after Haniyeh and Daughter tried to prevent Defendant from entering the bedroom with a knife, Defendant forced his way inside and strangled and stabbed Haniyeh in Daughter's proximity. Taken in the light most favorable to the State, this evidence supports an inference that Defendant abused Daughter where her close proximity to his strangling of Haniyeh, and her presence in the room while he wielded a knife and repeatedly stabbed Haniyeh, exposed her to "substantial risk of injury" such that a reasonable juror *could* have concluded that Defendant committed misdemeanor child abuse. *See Watkins*, 247 N.C. App. at 396; N.C.G.S. § 14-318.2(a). Thus, we hold that the trial court did not err in denying Defendant's motion to dismiss the misdemeanor-child-abuse charge.

## 2. *First-Degree Kidnapping*

Defendant next argues the trial court erred in denying his motion to dismiss because the State adduced "no evidence of confinement, restraint, or removal separate from any which was inherent in the assaults and attempted murder." We disagree here as well.

### a. Substantial Evidence

A defendant commits kidnapping by "unlawfully confin[ing], restrain[ing], or remov[ing] from one place to another, any person . . . without [her] consent" "for the purpose of" either "facilitating . . . any felony" or "doing serious bodily harm to or terrorizing" her. N.C.G.S. § 14-39(a). It rises to the first degree if that same defendant either "seriously injure[s]" or fails to release the person "in a safe place." *Id.* § 14-39(b). Confinement is "some form of imprisonment within a given area," *e.g.*, "a room, a house[,] or a vehicle," while restraint "connotes a restriction" in movement "by force, threat or fraud[ ] without a confinement." *State v. Fulcher*, 294 N.C. 503, 523 (1978).

Here, the evidence tended to show that, after forcing the bedroom door open, Defendant trapped Haniyeh in the bedroom corner by the door, hemmed in by a dresser, while he wielded a knife between her and the doorway. Taken in the light most favorable to the State, this evidence supports an inference that Defendant "confined" Haniyeh "without her consent" for the "purpose of doing bodily harm" and seriously injuring her such that a reasonable juror *could* have concluded that Defendant committed first-degree kidnapping. *See Watkins*, 247 N.C. App. at 396;

STATE V. SANDI

*Opinion of the Court*

N.C.G.S. § 14-39(a).

Notably, Defendant does not contend that the State failed to offer substantial evidence of the elements of first-degree kidnapping, but that any evidence of restraint was an inherent element of his other assaults, asserting that, "where any confinement or restraint here was simply an inherent, inevitable element of the underlying felonies of attempted murder, AWDWIKISI, and assault by strangulation, all of which the jury convicted on, no separately punishable offense of kidnapping can exist." By Defendant's own admission, this evidence could support a conviction of first-degree kidnapping. Thus, we hold that the trial court did not err in denying Defendant's motion to dismiss the first-degree kidnapping charge.

### b. *Double Jeopardy*

Defendant also argues that no evidence of restraint or confinement can support a separate conviction for kidnapping because it inheres in the underlying felonies of attempted first-degree murder, AWDWIKISI, and assault by strangulation. This implies a double-jeopardy argument, not an evidence-insufficiency one. Essentially, he believes that his multiple punishments for the same offense violate the constitutional prohibition against double jeopardy. *See* U.S. Const. amend. V. Defendant did not properly preserve this double-jeopardy argument because he failed to ask the trial court to arrest judgment at sentencing. *See State v. Mulder*, 233 N.C. App. 82, 86–87 (2014); N.C. R. App. P. 10(a)(1). But even if he had done so, double jeopardy does not preclude punishing Defendant for kidnapping, attempted

first-degree murder, AWDWIKISI, *and* assault by strangulation where our legislature intends to punish them as separate offenses. *See Ohio v. Johnson*, 467 U.S. 493, 499 (1984) ("[T]he question under the Double Jeopardy Clause [as to] whether punishments are 'multiple' is essentially one of legislative intent.").

We have long recognized that certain felonies require at least "some restraint of the victim." *Fulcher*, 294 N.C. at 523. The General Assembly did not intend the kidnapping statute "to make a restraint, which is an inherent, inevitable feature of such other felony, also kidnapping so as to permit the conviction and punishment of the defendant for both crimes." *Id.* "To hold otherwise would violate the constitutional prohibition against double jeopardy." *Id.*; *accord State v. Gardner*, 315 N.C. 444, 452 (1986) ("The Double Jeopardy Clauses of both the United States and North Carolina Constitutions prohibit a court from imposing more punishment than that intended by the legislature."). But we have also clarified that two or more criminal offenses may arise from the same course of action and that a conviction for kidnapping does not violate double jeopardy when the restraint supporting the kidnapping "is a separate, complete act, independent of and apart from the other felony." *State v. China*, 370 N.C. 627, 634 (2018) (quoting *Fulcher*, 294 N.C. at 523). While constitutional protections against double jeopardy do not preclude convictions for both kidnapping and another felony from the same course of action, the "restraint" constituting the kidnapping must be "separate and apart from that which . . . inhere[s] in the commission of the other felony." *Fulcher*, 294 N.C. at 523.

But restraint is not an inherent element of either AWDWIKISI or assault by strangulation. *See State v. Carrillo*, 115 N.C. App. 674, 677 (2018) (holding that AWDWIKISI "is not within that class of felonies" because it "may be committed without ever necessitating the restraint or confining the victim"); *State v. Braxton*, 183 N.C. App. 36, 41 (2007) (holding that "nothing in the statutory definition of assault by strangulation . . . requires proof that the perpetrator restrained the victim in any manner, with the exception of the act of strangulation"). Thus, any evidence of restraint is necessarily separate and apart from the elements of either AWDWIKISI or assault by strangulation. *See Carrillo*, 115 N.C. App at 677; *Braxton*, 183 N.C. App. at 41. We have yet to decide whether restraint is an inherent element of attempted first-degree murder. *See State v. Johnson*, 183 N.C. App. 576, 581 (2007) (declining to resolve question). Its express elements are: "(1) a specific intent to kill another person unlawfully; (2) an overt act calculated to carry out that intent, going beyond mere preparation; (3) the existence of malice, premeditation, and deliberation accompanying the act; and (4) a failure to complete the intended killing." *State v. Peoples*, 141 N.C. App. 115, 117 (2000) (citing N.C.G.S. § 14-17). Here, nothing in the statutory definition of attempted first-degree murder requires proof of either restraint or confinement. Accordingly, we conclude that attempted first-degree murder falls outside that "inherent" class of offenses.

Even assuming *arguendo* that attempted first-degree murder does fall within that "inherent" class, a kidnapping conviction may still stand where the evidence

demonstrates confinement or restraint independent of the attempted killing. Consistent with these principles, the restraint's occurrence during the same course of conduct as the assaults does not preclude a separate kidnapping conviction so long as the restraint was distinct from that necessary to commit the other offenses. *See Fulcher*, 294 N.C. at 523; *China*, 370 N.C. at 634. Where, as here, the evidence shows Haniyeh's restraint independent from the elements of the underlying felonies, Defendant's kidnapping conviction does not violate double-jeopardy principles. *See Johnson*, 83 N.C. App. at 581.

## IV.  Conclusion

For the reasons above, this Court holds the trial court did not err (1) by denying Defendant's motion for a mistrial; (2) by denying his motion to dismiss the charge of misdemeanor child abuse; and (3) by denying his motion to dismiss the charge of first-degree kidnapping.

NO ERROR.

Chief Judge DILLON concurs.

Judge HAMPSON concurs by separate opinion.

No. COA25-430 – *State v. Sandi*

HAMPSON, Judge, concurring.

I agree with the majority that the trial court did not abuse its discretion by denying Defendant's Motion for Mistrial. I also agree the trial court did not err in denying Defendant's Motions to Dismiss. I write separately to clarify two points.

First, our standard of review for reviewing the denial of a mistrial is very clear. We review for an abuse of discretion by the trial court. We review alleged constitutional errors de novo. Here, no party claimed anything else. Certainly, there was no suggestion that we apply the statutory standard of review applicable to administrative claims under the Administrative Procedure Act. Any analysis on that front only confuses the matter. It suffices to say, upon review of the Record there was no error arising to a violation of due process—and, in turn, the trial court did not abuse its discretion by denying the Motion to Dismiss.

Second, I agree that there was sufficient evidence of restraint or confinement beyond that inherent in the other offenses to support submission of the kidnapping charge to the jury. I, however, believe it is important to make clear that this specific evidence was Defendant's act of trapping the victim behind the door against the dresser. This act was beyond that inherent in the stabbing of the victim.